IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| AUDIOPOD IP, LLC, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Lead Civil Action No. 3:24CV406 (RCY) |
| | ) | |
| AMAZON.COM, INC., *et al.*, | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM OPINION**

This is a consolidated patent infringement action brought by AudioPod IP, LLC ("Plaintiff") against Amazon.com, Inc., Amazon.com LLC, Amazon Web Services, Inc. ("AWS") (collectively, "Amazon," or "Amazon Defendants") and Audible, Inc. ("Audible"). The instant matter is before the Court on Defendants' Motion to Dismiss, Dkt. I, [1] ECF No. 17 ("Docket I Motion to Dismiss"), and Defendants' Motion to Dismiss, Dkt. II, ECF No. 16 ("Docket II Motion to Dismiss"). The motions have been fully briefed, and the Court dispenses with oral argument because the facts and legal contentions are adequately presented in the materials before the Court, and oral argument would not aid in the decisional process. E.D. Va. Loc. Civ. R. 7(J). For the reasons stated below, the Court will grant in part and deny in part the Docket I Motion to Dismiss but will deny the Docket II Motion to Dismiss in full.

---

[1] This memorandum opinion resolves motions from two dockets that have since been consolidated. Order, ECF No. 51. For ease of reference, the Court refers to Civil Case No. 3:24CV406 as Docket I, and Civil Case No. 3:24CV407 as Docket II.

# I. BACKGROUND

## A. The Parties[2]

As noted, Plaintiff names four entities as defendants: Amazon.com, Inc., Amazon.com LLC, AWS, and Audible. *See generally* Compl. ("Dkt. I Compl."), Dkt. I, ECF No. 1 (naming Amazon defendants and Audible); Compl. ("Dkt. II Compl."), Dkt. II, ECF No. 1 (naming Amazon defendants only). Amazon.com, Inc. wholly owns Amazon.com LLC. Dkt. I Compl. ¶ 6. AWS is a subsidiary and controlled affiliate of Amazon.com, Inc. *Id.* ¶ 14. Each of the Amazon defendants operate their principal places of business in Seattle, Washington. *Id.* ¶¶ 3, 6, 13. Audible is also a subsidiary and controlled affiliate of defendant Amazon.com, Inc., but it operates its principal place of business in Newark, New Jersey. *Id.* ¶¶ 9, 10. Each defendant, including Audible, is incorporated in Delaware. *Id.* ¶¶ 3, 6, 9, 13.

Amazon is "the world's largest online retailer and marketplace and provider of cloud computing services." *Id.* ¶ 24. Amazon recently established a secondary headquarters, known as "HQ2" in the National Landing neighborhood of Arlington, Virginia. *Id.* ¶ 26. HQ2 currently houses 30,000 employees and will soon add an additional 25,000. *Id.* HQ2 does not, however, house any Audible employees. [3] Decl. Anne Erni ¶ 4, Dkt. I, ECF No. 19. In fact, Audible's only "physical" presence in Virginia is its use of the AWS datacenter in Ashburn, Virginia. Opp'n to

---

[2] This section is relevant only to the portion of the Docket I Motion to Dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(3). Dkt. I Mem. Supp. 17–20. In considering such a Motion to Dismiss, the Court may freely consider evidence outside the pleadings. *Aggarao v. MOL Ship Mgmt. Co.*, 675 F.3d 355, 365–66 (4th Cir. 2012). The Court "considers to be true any well-pleaded allegations of the complaint that bear on venue, unless contradicted by defendant's affidavit evidence." *Symbology Innovs., LLC v. Lego Sys., Inc.*, 282 F. Supp. 3d 916, 924–25 (E.D. Va. 2017) (quoting 14D Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* j§ 3826 nn.3–4, 28–29 (4th ed. 2024) (collecting cases)).

[3] Plaintiff contests this fact. Dkt. I Mem. Opp'n 30. However, it provides no contrary support from its position aside from the bald allegations in its own Complaint. *Id.* (citing Dkt. I. Compl. ¶ 26). Thus, the Court will rely on the sworn statement asserting that HQ2 does not house any Audible employees and will consider the matter undisputed. *Symbology Innovs.*, 282 F. Supp. 3d at 924–25 (explaining that, in the context of a Rule 12(b)(3) motion to dismiss, the complaint is taken as true except where contradicted by defendant's affidavit).

Defs.' Mot. Dismiss ("Dkt. I Mem. Opp'n") 27–28, Dkt. I, ECF No. 21; Dkt. I Mem. Opp'n Ex. 1, Dkt. I, ECF No. 21-2; Dkt. I Mem. Opp'n Ex. 2, Dkt. I, ECF No. 21-3.  The AWS datacenter "installs, hosts, stores, operates, and maintains Audible's Northern-Virginia-based servers."  Dkt. I Mem. Opp'n 28.

Despite its absence from the HQ2 campus, Audible's business dealings are otherwise heavily related to Amazon's.  For instance, Amazon employees sometimes support both Amazon and Audible, and Amazon jointly promotes Amazon and Audible products.  Dkt. I Mem. Opp'n 23; Dkt. I Mem. Opp'n Ex. 5, Dkt. I, ECF No. 21-6; Dkt. I Mem. Opp'n Ex. 7, Dkt. I, ECF No. 21-8.  Audible's revenue is also included in Amazon's revenue calculations.  Dkt. I Mem. Opp'n 30; Dkt. I Mem. Opp'n Ex. 8, Dkt. I, ECF No. 21-8.

## B. Patents-in-Suit[4]

Plaintiff alleges that Defendants infringe five patents.  Dkt. I Compl. ¶¶ 51–62; Dkt. II Compl. ¶¶ 67–153.  The patents-in-suit work together as a patent family, each relating to streaming media.  *See* Dkt. I Compl. ¶¶ 41–43; Dkt. II Compl. ¶¶ 56–59.  Plaintiff highlights that, at the time of the underlying inventions, users could only enjoy media—namely, audiobooks—by downloading large audio files to one's computer.  Dkt. I Compl. ¶ 41; Dkt. II Compl. ¶ 57.  Thus, Plaintiff conceived of a streaming process, in which streaming files were "segment[ed] and sequence[d] . . . so that these files could be streamed irrespective of their sizes."  Dkt. I Compl. ¶ 41; Dkt. II Compl. ¶ 57.  Together, the instant patents allow users to stream media with less interruption and in more formats, all while tracking and synchronizing the user's progress between

---

[4] This section relates only to Defendants' Motions to Dismiss under Rule 12(b)(6).  When deciding a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court "accept[s] as true the plaintiff's well-pleaded allegations and views all facts and draws all reasonable inferences in the light most favorable to plaintiff." *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).  Such a standard, however, does not require accepting any unreasonable inferences or plaintiff's legal conclusions.  *Id.*  Additionally, a court may consider any documents attached to the complaint.  *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448 (4th Cir. 2011).

devices and between formats. *See* Dkt. I Compl. ¶¶ 41–43; Dkt. II Compl. ¶¶ 56–59. The Court

describes each of the interrelated patents below.[5]

    1. The "Descriptor File" Patents: '907 and '720

        *a. U.S. Patent 9,729,907 ("The '907 Patent or Patent '907")*[6]

The '907 Patent discloses a method of synchronizing incongruous, related media (such as

an eBook and derivative audiobook) across devices. *See* Dkt. I Compl. Ex. 1 (hereinafter, "Patent

'907") at 39:39–55, 41:46–42:9, Dkt. I, ECF No. 1-1. First, a "descriptor file" is created. Patent

'907 at 41:47–55. The descriptor file works as an intermediary between two (or more) streams of

the same work in varying media formats, so the user may synchronize their progress in the work

between the corresponding formats. *Id.* at 41:62–42:9. For instance, using the descriptor file, a

user could synchronize their progress in an eBook version of *Moby Dick* with their progress in the

*Moby Dick* audiobook, so that they could toggle between the two without issue. *See id.* at 39:39–

55, 41:46–42:9. The descriptor file does so by operating like a guidebook for streaming devices,

communicating to the device how one media file relates to another. *Id.* Specifically, the file

stores the location of the related media files; identifies and stores time offsets for different content

points (e.g., the beginning of a chapter); and identifies, selects, and stores synchronization points

between the media files. *Id.*

The specific method disclosed by the '907 Patent is as follows:

> A method comprising: creating a descriptor file for synchronizing a
> plurality of digital media streams, wherein the plurality of digital media streams
> each contain digital media content corresponding to a same originating work,

---

[5] The Court describes and analyzes the patents-in-suit in the same order as they are addressed in Defendants' Motions to Dismiss, *see generally* Dkt. I Mem. Supp.; Dkt. II Mem. Supp., except that it combines the analyses of the two Descriptor File Patents. *See infra* I.B.1.

[6] Given the absence of "any meaningful argument for the distinctive significance of any claim limitations" the Court treats the first claim of each patent-in-suit as representative of the entirety of each respective patent. *Affinity Labs Tex., LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1256 (Fed. Cir. 2016) (quoting *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1352 (Fed. Cir. 2016)).

wherein the plurality of digital media streams includes a first digital media stream containing a digital audio narration of the originating work and one or more other digital media streams, and wherein the descriptor file is external to the first digital media stream;

storing location information for the plurality of digital media streams in the descriptor file;

identifying a plurality of time offsets in a timeline of the digital audio narration of the first digital media stream, wherein the plurality of time offsets correspond to a plurality of content points in the digital audio narration;

storing the plurality of time offsets and the plurality of content points in the descriptor file in a manner indicating a correlation between the plurality of time offsets and the plurality of content points;

identifying synchronization points in the digital media content of the one or more other digital media streams;

selecting synchronization time offsets that correspond to the synchronization points from the plurality of time offsets; and

and storing the synchronization time offsets and the synchronization points in the descriptor file in a manner indicating a correlation between the synchronization time offsets and the synchronization points, such that the descriptor file allows a synchronized rendering of the plurality of digital media streams on a client device.

*Id.* at 52.

### b. U.S. Patent 9,319,720 ("the '720 Patent" or "Patent '720")

The '720 Patent discloses a process substantially similar to the '907 Patent, except that the '720 Patent discloses a method in which a descriptor file is used to synchronize and simultaneously render corresponding media streams. Dkt. II Compl. Ex. 1 (hereinafter, "Patent '720"), 40:23–53, Dkt II, ECF No. 1-1. When used in one of the preferred embodiments, the disclosed method creates a "read-along effect" between a written work and its audio derivative. *Id.* at 29:58–64. Thus, where the '907 Patent allows for a user to toggle between an eBook and an audiobook, the '720 Patent reconciles eBook streams and derivative audiobook streams so that a single device may stream them simultaneously. *See id.* at 40:23–53.

The specific method claimed by the '720 Patent is as follows:

A method of rendering digital content comprising: providing a media player having access to at least one server via a network, the at least one server having stored thereon a descriptor file and a plurality of media streams derived from a same

5

originating written work, each media stream including a plurality of digital data files, the descriptor file including information allowing a simultaneous synchronized rendering of the plurality of media streams that provides a literary experience of the originating written work, the information including time information for each digital data file in each media stream, the time information for synchronizing the plurality of media streams and determined relative to a timeline of an audio recording of the originating written work;

determining a first digital data file from the plurality of digital data files in a first media stream from the plurality of media streams, the first digital data file having digital content to be rendered with the media player, and determined using the time information in the descriptor file and a predetermined time offset, the predetermined time offset external to the descriptor file and determined relative to the timeline of the audio recording;

downloading the first digital data file or a digital data segment contained in the first digital data file and determined using the time information in the descriptor file from the at least one server so that the digital content is resident with the media player;

and rendering the digital content using the media player at an arbitrary point determined using the predetermined time offset.

*Id.* at 40:23–53.

2. U.S. Patent 9,954,922 ("the '922 Patent or Patent '922")

The '922 Patent aims to solve interruptions in media streaming, as well as the difficulty associated with accessing the same content on two, asynchronous devices. *See* Dkt. II Compl. Ex. 2 (hereinafter, "Patent '922") at 2:24–39; 14:40–15:27. Specifically, the '922 Patent discloses a method of rendering digital content across devices so the user can end a stream on one device and resume it at the same point on a second device, effectively "bookmarking" the user's progress. *Id.* at 16:18–40. The '922 Patent enables the user device to do so—and do so without needless interruption—by disclosing a method in which a device downloads only the portion of the content stream immediately surrounding the user's current position. *Id.* at 16:18–24. The user's position in the stream is tracked, and a digital "bookmark" is created at that position. *Id.* at 16:25–30. The "bookmark" is a specific, digital construct which contains information for identifying the relevant streaming content and the user's bookmarked position. *Id.* at 16:27–30. When a user streams the same content on a second device, the bookmark is transferred to that device. *Id.* at 16:31–32. Like

6

the first device, the second device only loads a portion of the content around the user's current

position in the content. *Id.* at 16:46–59.

The specific method set out in claim one of the '922 Patent is as follows:

> A method of rendering digital content across multiple client devices comprising: downloading first digital content corresponding to a media work from a network accessible library to a first client device via a network, the first digital content including at least a first portion of a first media stream;
>
> storing the first digital content on the first client device; rendering at least a portion of the first digital content on the client device;
>
> tracking a current position in the first media stream as the first digital content is rendered;
>
> creating a bookmark by setting the current position as a bookmarked position, the bookmark including information for identifying the media work and the bookmarked position;
>
> transferring the bookmark to a second client device via the network;
>
> downloading second digital content corresponding to the media work from the network accessible library to the second client device via the network, the second digital content including at least a second portion of the first media stream or at least a portion of a second media stream, the second portion of the first media stream or the portion of the second media stream including the bookmarked position;
>
> storing the second digital content on the second client device;
>
> rendering at least a portion of the second digital content on the second client device in dependence upon the bookmarked position;
>
> identifying a range of content surrounding the bookmarked position in the second digital content as content to be retained;
>
> releasing storage resources allocated to all content of the second digital content that is not identified as content to be retained on the second client device;
>
> determining whether sufficient storage is available on the second client device to meet storage demand after releasing the storage resources allocated to the content of the second digital content that is not identified as content to be retained;
>
> and if insufficient storage is available, narrowing the range of content surrounding the bookmarked position that is identified as content to be retained.

*Id.* at 16:16–59.

3. U.S. Patent 10,091,266 ("The '266 Patent or Patent '266")

The '266 Patent is similar to the Descriptor File Patents in that it aims to solve the "tracking

problems" that arise while streaming related media on different devices. *See* Dkt. II Compl. Ex. 3

(hereinafter, "Patent '266") at 2:33–40, Dkt. II, ECF No. 1-2. Specifically, the '266 Patent claims

a method for synchronizing streams of content between multiple devices to play simultaneously. *See id.* at 16:43–51.  The patented method does so through the use of two devices and a server.  *Id.* at 16:26–42.  On the first digital device, a user selects a position in time within a piece of digital content.  *Id.* at 16:30–35.  An identifier is then assigned to the content.  *Id.* at 16:32–34.  This first device creates and communicates a specific construct to the server which includes information about the user's position as well as the assigned identifier.  *Id.* at 16:37–43.  That construct is then downloaded by the second device from the server.  *Id.*  Using the construct, the second device is able to open the same piece of content at the same position.  *Id.* at 16:43–52.  The devices are then able to render the same content simultaneously.  *Id.*  To optimize the devices' streaming and prevent needless interruption, the '266 Patent also comprises a process by which the devices constantly identify the necessary content surrounding each device's position in the content and purge unnecessary files.  *Id.* at 16:55–64.

The specific method set out by claim one of the '266 Patent is as follows:

A method of rendering digital content across multiple client devices comprising: rendering on a first client device at least a portion of primary digital content;

determining on the first client device an identifier corresponding to the primary digital content, wherein the identifier identifies a descriptor of the primary content;

determining on the first client device a first position in the primary digital content;

transferring the identifier and the first position from the first client device to a second client device via a network accessible library;

downloading the descriptor from the network accessible library to the second client device by using the identifier;

rendering on the second client device at least a portion of secondary other digital content associated with the primary digital content by using the descriptor and the first position, wherein the secondary digital content is ancillary to the primary digital content, and wherein the secondary digital content is rendered on the second client device simultaneously and in synchronization with the rendering of the primary digital content on the first client device;

identifying a range of content surrounding the first position in the primary digital content as content to be retained;

8

releasing storage resources allocated to all content of the primary digital content that is not identified as content to be retained on the first client device;

identifying content in the secondary digital content that is related to the range of content surrounding the first position in the primary digital content as content to be retained;

and releasing storage resources allocated to all content of the secondary digital content that is not identified as content to be retained on the second client device.

*Id.* at 16:28–64.

4. U.S. Patent 10,735,488 ("the '488 Patent" or "Patent '488")

The '488 Patent seeks to further improve streaming of digital content by enabling user devices to switch to a more efficient server mid-content stream. Dkt. II Compl. Ex. 4 (hereinafter, "Patent '488") at 16:31–60. Specifically, the '488 Patent discloses a method by which a user device downloads a list of available, potential servers. *Id.* at 16:33–35. This list tracks server level statistics for each server and then downloads a segment of content from the fastest or most efficient server. *Id.* at 16:37–43. If the speed or quality of the downloads from the first server degrade, the client device will select the next fastest server from the list and then download the next portion of the content from it. *Id.* at 16:51–60.

The method specifically disclosed by the '488 Patent reads as follows:

A method of downloading digital content to be rendered, comprising: downloading from a network accessible server to a client device a list of content servers that are capable of serving requested digital content;

tracking service level statistics for the content servers in the list of content servers;

selecting a first content server to serve the requested digital content from the list of content servers in dependence upon the service level statistics;

downloading a first segment of the requested digital content from the first content server to the client device for rendering;

in the event of a degradation in service from the first content server, selecting a second content server to replace the first content server in serving the requested digital content from the list of content servers in dependence upon the service level statistics, wherein the server replacement is imperceptible to a user of the client device;

and downloading a second segment of the requested digital content from the second content server to the client device for rendering;

9

wherein the requested digital content is a digital media stream that includes the first and second segments, wherein the first content server is a first library server having the digital media stream stored thereon, and wherein the second content server is a second library server having a copy of the digital media stream stored thereon.

*Id.* at 16:31–60.

## II. PROCEDURAL HISTORY

Plaintiff filed both of the underlying actions on May 30, 2024.  Dkt. I Compl., Dkt. I, ECF No. 1; Dkt. II Compl., Dkt. II, ECF No. 1.  On August 26, 2024, Defendants moved to dismiss both actions.  Dkt. I Mot. Dismiss, Dkt. I, ECF No. 17; Dkt. II Mot. Dismiss, Dkt. II, ECF No. 16.  Plaintiff filed responses as to both Motions on September 9, 2024.  Opp'n Defs.' Mot. Dismiss ("Dkt. I Mem. Opp'n"), Dkt. I, ECF No. 21; Opp'n Defs.' Mot. Dismiss ("Dkt II Mem. Opp'n"), Dkt. II, ECF No. 19.  On September 16, 2024, Defendants filed their replies as to both Motions.  Reply Br. Supp. Defs.' Mot Dismiss ("Dkt. I Reply"), Dkt. I, ECF No. 23; Reply Br. Supp. Defs.' Mot. Dismiss ("Dkt. II Reply"), Dkt. II, ECF No. 21.   On January 15, 2025, the Court conducted an initial pretrial conference and, after hearing from the parties, consolidated the actions.  Order, Dkt. I, ECF No. 51; Order, Dkt. II, ECF No. 49.

## III. LEGAL STANDARD

### A. Rule 12(b)(6)

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses."  *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (citing 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356 (4th ed. 2024)).  Dismissals under Rule 12(b)(6) are generally disfavored by the courts because of their res judicata effect.  *Fayetteville Invs. v. Com. Builders, Inc.*, 936 F.2d 1462, 1471 (4th Cir. 1991).  Federal Rule of Civil Procedure 8 only requires that a complaint set forth "'a short and plain statement of

the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level," "detailed factual allegations" are not required in order to satisfy the pleading requirement of Federal Rule 8(a)(2). *Id.* (citations omitted). The plaintiff's well-pleaded allegations are assumed to be true, and the complaint is viewed in the light most favorable to the plaintiff. *Mylan Lab'ys, Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993) (citations omitted); *see also Martin*, 980 F.2d at 952.

However, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Labels and conclusions," a "formulaic recitation of the elements," and "naked assertions" without factual enhancement are insufficient. *Id.*

### B. Rule 12(b)(3)

Federal Rule of Civil Procedure 12(b)(3) allows a party to move to dismiss a case for "improper venue." Fed. R. Civ. P. 12(b)(3). Title 28 U.S.C. § 1406 provides that "[t]he district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C. § 1406(a).

11

Unlike a Rule 12(b)(6) motion, evidence outside the pleadings may be "freely consider[ed]" in ruling on a Rule 12(b)(3) motion. *Sucampo Pharms., Inc. v. Astellas Pharma, Inc.*, 471 F. 3d 544, 550 (4th Cir. 2016); *see also supra* n.2. "In the Fourth Circuit, when a challenge to venue is raised, the plaintiff bears the burden of demonstrating that venue is appropriate." *Stone v. Wells Fargo Bank, N.A.*, 361 F. Supp. 3d 539, 549 (D. Md. 2019) (citing *Bartholomew v. Va. Chiropractors Ass'n*, 612 F.2d 812, 816 (4th Cir. 1979)). The Court "considers to be true any well-pleaded allegations of the complaint that bear on venue, unless contradicted by defendant's affidavit evidence." *Symbology Innovs., LLC v. Lego Sys., Inc.*, 282 F. Supp. 3d 916, 924–25 (E.D. Va. 2017) (quoting 14D Wright & Miller, *supra*, § 3826 nn.3–4, 28–29 (collecting cases)).

## IV. DISCUSSION

In support of their Rule 12(b)(6) Motions to Dismiss, Defendants argue that Plaintiff fails to state a claim for patent infringement because each of the patents-in-suit are invalid. Dkt. I Mem. Supp. Mot. Dismiss ("Dkt. I. Mem. Supp") 9–12, Dkt. I, ECF No. 18; Dkt. II Mem. Supp. Mot. Dismiss ("Dkt. II Mem. Supp.") 14–20, Dkt. II, ECF No. 17. In the alternative, Defendants advance a Rule 12(b)(3) Motion to Dismiss, and argue that the Eastern District of Virginia is an improper venue as to Audible. Dkt. I Mem. Supp. 17–20. The Court finds that Plaintiff adequately states the validity of each patent and will deny Defendants' Motions to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). However, the Court agrees that the Eastern District of Virginia is an improper venue for Plaintiff's claim against Audible and will grant the Rule 12(b)(3) Motion to Dismiss with respect to those claims.

### A. Validity of the Patents-in-Suit

Under 35 U.S.C. § 282, patents are presumed valid. 35 U.S.C. § 282(a). "The burden of establishing invalidity of a patent . . . rest[s] on the party asserting such invalidity." *Id.* A

challenging party may rebut that presumption by demonstrating that it purports to protect patent-ineligible subject matter.  *See, e.g.*, *Alice Corp. Pty. Ltd. v. CLS Bank Intern.*, 573 U.S. 208, 216 (2014).

The Patent Act provides that "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor."  35 U.S.C. § 101.  However, based on a concern that patents could be used to monopolize "the basic tools of scientific and technological work," *Alice*, 573 U.S. at 216, courts have exempted "[l]aws of nature, natural phenomena, and abstract ideas" from patent-eligible subject matter.  *Id.* ("Monopolization of those tools through the grant of a patent might tend to impede innovation more than it would tend to promote it, thereby thwarting the primary object of the patent laws.") (citation omitted).

Defendants argue that each patent-in-suit is wholly directed to an abstract idea.  Dkt. I Mem. Supp. 9–12; Dkt. II Mem. Supp. 14–20.  Thus, the Court must determine whether the instant patents "claim the building blocks of human ingenuity" or whether they "integrate the building blocks into something more."  *Alice*, 573 U.S. at 216 (internal quotation omitted).

The Federal Circuit and the Supreme Court have set out a two-step framework (the "*Alice* test") for performing the patent-eligibility analysis.  First, the Court must determine "whether the claims at issue are directed to one of those patent-ineligible concepts" such that it "risk[s] disproportionately tying up the use of . . . underlying ideas."  *Id.* (internal citation omitted).  Of course, "all inventions at some level embody, use, reflect, rest upon, or apply laws of natural, natural phenomena, or abstract ideas."  *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 71 (2012).  Thus, the fact that a patent implicates ineligible subject matter does not mean that the patent is so *directed*, rather, "the claims are considered in their entirety to ascertain whether their character *as a whole* is directed to excluded subject matter."  *Internet Pats. Corp. v. Active*

*Network, Inc.*, 790 F.3d 1343, 1346 (Fed. Cir. 2015) (emphasis added). While conducting step one of the analysis, courts "'must be careful to avoid oversimplifying the claims' by looking at them generally and failing to account for the specific requirements of the claims." *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1314 (Fed. Cir. 2016). Instead, the Court must focus on the specific contours of the patent, as outlined by the language of the claim. *Contour IP Holding LLC v. GoPro, Inc.*, 113 F.4th 1373, 1380 (Fed. Cir. 2024).

Abstract ideas are amongst those exempted from patentable subject matters. *Alice*, 573 U.S. at 216. "An idea is abstract if it has 'no particular concrete or tangible form.'" *Nomula v. Hirshfeld*, 561 F. Supp. 3d 617, 623 (E.D. Va. 2021) (quoting *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 715 (Fed. Cir. 2014)). "The Supreme Court has not established a definitive rule to determine what constitutes an 'abstract idea.'" *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016). Caselaw has, however, determined that the category may vary broadly in kind, from "preexisting, fundamental truths," *id.* (quoting *Alice*, 573 U.S. at 220), to existing, everyday human practices, *Salwan v. Iancu*, 825 F. App'x 862, 866 (Fed. Cir. 2020). "As a general matter, claims directed to 'a result' rather than 'a way of achieving [that result]' are directed to abstract ideas." *Dialect, LLC v. Amazon.com, Inc.*, 701 F. Supp. 3d 332, 339 (E.D. Va. 2023) (citing *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1167–68 (Fed. Cir. 2018)).

"For technology involving computers like the [instant patents], the step-one analysis often hinges on 'whether the focus of the claims is on the specific improvement in computer capabilities . . . or, instead, on a process that qualifies as an 'abstract idea' for which computers are invoked merely as a tool.'" *Ocado Innov., Ltd. v. AutoStore AS*, 561 F. Supp. 3d 36 (D.N.H. 2021) (quoting *Enfish*, 822 F.3d at 1336)). Put differently, "at step one, courts determine whether a patent's claimed advance represents a concrete 'technological solution to a technological problem.'" *Id.* (quoting *Packet Intel. LLC v. NetScout Sys. Inc.*, 965 F.3d 1299, 1309 (Fed. Cir. 2020)). A "telltale

14

sign" that a patent is directed to an abstract idea "is when the claimed functions are mental processes that can be performed in the human mind or using a pencil and paper." *Trinity Info Media LLC v. Covalent, Inc.*, 72 F.4th 1355, 1361–62 (Fed. Cir. 2023) (cleaned up) (citations omitted).

If a patent is directed to an abstract idea, *Alice* step two requires the Court to examine the non-abstract elements of the claim to determine whether they amount to an "inventive concept sufficient to transform the claimed abstract idea into a patent-eligible application." *Alice*, 573 U.S. at 221. That examination requires the Court to consider any non-abstract elements individually and in relation to the entire claim. *Id.* at 217. An inventive concept is something more than "the application of an abstract idea using well-understood, routine, and conventional activities previously known to the industry." *Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306. 1316 (Fed. Cir. 2019) (citation omitted).

"The question of whether a claim element or combination of elements is well-understood, routine, and convention to a skilled artisan in the relevant field is a question of fact." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018). A claim directed to an abstract idea is invalid as a matter of law, however, if it merely combines the abstract idea with "generic computer components," *In re TLI Commc'ns LLC Pat. Litig.*, 823 F.3d 607, 614 (Fed. Cir. 2016), or limits the abstract idea to "a particular technological environment," *Alice*, 573 U.S. at 223.

1. The Descriptor File Patents

Defendants argue that Patents '907 and '720 (collectively, the "Descriptor File Patents") are invalid because they are wholly directed to abstract ideas. Dkt. I Mem. Supp. 13–16; Dkt. II Mem. Supp. 18–19. As to the '907 Patent, Defendants first argue that the '907 Patent merely relates to the storage, presentation, and streaming of information, which are impermissibly abstract ideas. Dkt I Mem. Supp. 15. Second, as to both Descriptor File Patents, Defendants argue that

the claimed methods are mere abstractions of existing human practices and are likewise unpatentable. *Id.* at 13–15; Dkt. II Mem. Supp. 18–19.  In response, Plaintiff argues that both patents represent "improvements to media streaming network platforms," which constitute concrete, patentable advances over the prior art.  Dkt. I Mem. Opp'n 16–17; Dkt II. Mem. Opp'n 24–25.

Here, the Court finds that neither Descriptor File Patents are, as a whole, directed to an abstract idea.  Both Patents identify a specific problem in the existing art—most significantly, the "tracking" problems when streaming corresponding media in diverging formats, such as an eBook and derivative audiobook—and proposes the descriptor file as a specific, concrete solution to the problem.  Patent '907 at 2:22–29, 41:46–42:9; Patent '720 at 2:33–43, 2:63–3:5.  The descriptor file is likewise no abstract thing; it communicates between two otherwise incongruous streams, by identifying, selecting, and storing time offsets.  Patent '907 at 41:46–42:9; Patent '720 at 2:63–3:5, 40:23–53.  Such an invention is far from the abstract idea prohibited by case law, and is clearly a concrete improvement over the state of the art. *See Packet Intel.*, 965 F.3d at 1309.  As such, the Court finds that the Descriptor File Patents survive the *Alice* test at step one and will deny the Defendants' Motions to Dismiss as to the '907 Patent and the '720 Patent.

The Court finds Defendants' arguments to the contrary unconvincing.  Defendants first argue that the '907 Patent is impermissibly abstract because it merely describes an abstract idea about storing, presenting, and streaming information.  Dkt. I Mem. Supp. 10, 15.  The Court finds that this description of the invention claimed by the '907 Patent is a gross oversimplification. While the abstract manipulation of information is certainly implicated by the instant invention—as would be the case with almost all patents involving software—the crux of the '907 Patent is not *directed* to such manipulation.  Rather, information manipulation is the mere tool by which the patent solves a concrete problem.  Because the patent's "focus [is] on a specific means or method

that improves the relevant technology," *McRO, Inc.*, 837 F.3d at 1314, it is not directed to an abstract idea.

Defendants next argue that the Descriptor File Patents are merely abstractions of human activities, since humans have been synchronizing media streams with one another long before the advent of computers. Dkt. I Mem. Supp. 15 (likening the '907 Patent to the movement of backdrops at particular moments in a stage play); Dkt. II Mem. Supp. 19 (likening the '720 Patent to reading a book out loud). Defendants are correct that patents using computers as a tool to simply implement existing human practice are considered wholly directed to abstract concepts. *E.g.*, *Enco Sys., Inc. v. DaVincia, LLC*, 845 F. App'x 953, 957 (Fed. Cir. 2021) ("claims focused just on replacing 'pen and paper methodologies' with data synthesis technology'—without a focus on specific, assertedly improved processing techniques—[are] directed to an abstract idea") (quoting *Univ. Fla. Rsch. Found., Inc. v. Gen. Elec. Co.*, 916 F.3d 1363 (Fed. Cir. 2019)). However, Defendants again oversimplify the instant inventions. While humans may synchronize media in a broad sense, humans do not operate as descriptor files, reconciling otherwise incongruous media streams. In fact, humans have struggled to adequately synchronize the media streams covered by the Descriptor File Patents, which necessitated the inventions underlying Patents '907 and '720. *See, e.g.*, Patent '907 at 2:23–49; Patent '720 at 2:18–43. Accordingly, the Court rejects Defendants' argument that the disclosed methods are achievable by humans without computers.

The Court's conclusion is further supported by the cases on which Defendants themselves chiefly rely, notwithstanding the attending arguments. Dkt. I Mem. Supp. 15–16 (citing *Enco Sys., Inc. v. DaVincia, LLC*, 845 F. App'x 953, 957 (Fed. Cir. 2021); *Electric Power Group, LLC*, 830 F.3d at 1352–54); Dkt. II Mem. Supp. 18–19 (citing *Enco Sys., Inc.*, 845 F. App'x at 957). In *Enco Systems, Inc. v. DaVincia, LLC*, 845 F. App'x 953, 957 (Fed. Cir. 2021), the Federal Circuit determined that a patent was wholly directed to the abstract idea of synchronizing text captions to

audio when its claim simply described steps a human would take to perform the same task using analog methods. *Enco Sys.*, 845 F. App'x at 955. The patent did not assert an advance over the prior art; rather, it automated a human function. *Id.* at 957. In *Electric Power Group, LLC v. Alstom S.A.*, 830 F.3d 1350, 1352–54 (Fed. Cir. 2016), the Federal Circuit similarly held that a patent was directed to an abstract idea when it merely claimed a method by which one could analyze and display data. *Id.* Here, too, the patent purported to preempt a function which could be performed by humans. The claims in this case are distinguishable. The Court has described above how the function of the Descriptor File Patents could not be adequately performed by humans. *See Ocado Innov.*, 561 F. Supp. 3d at 49 (rejecting the defendant's likening of the patent to human activities when achieving the specific purpose of the instant invention would be very difficult for a human to do). Thus, Defendant's citations to *Enco* and *Electric Power Group* do not disturb the Court's analysis.

The Court finds that the Descriptor File Patents are far more like the patent in *McRO, Inc. v. Bandai Namco Games America, Inc.*, 837 F.3d 1299 (Fed. Cir. 2016), where the Federal Circuit affirmed the validity of a patent claiming a "method for automatically animating lip synchronization and facial express of three-dimensional characters." *Id.* at 1307. There, like here, the claim described a method of synchronization that asserted an improvement over the existing art, "us[ing] a combined order of specific rules that renders information into a specific format that is then used and applied to create desired results." *Id.* By using these "specific rules," the thrust of the *McRO* claim was directed to a "patentable, technological improvement" over existing techniques. *Id.* at 1316. Like the *McRO* claim, the claims of the Descriptor File Patents at issue in this case employ specific "rules" to define the contours and use of the descriptor file and are directed to a specific, technological improvements. Thus, as was the case in *McRO*, because the

Descriptor File Patents are "not directed to ineligible subject matter, [the Court does] not reach *Alice* step two." The Court will deny Defendants' Motions to Dismiss as to Patents '907 and '720.

2. Patent '922

Defendants argue that the '922 Patent fails the *Alice* test because it merely implements the abstract idea of "access[ing] portions of the same content in multiple places," which is then combined with conventional technology. Dkt. II Mem. Supp. 15, Dkt. II, ECF No. 15. In response, Plaintiff argues that the '922 Patent provides a specific solution to specific technological problems. Dkt. II Mem. Opp'n 16.

Like the '907 Patent, the Court finds that the '922 Patent is not directed to an abstract idea, but to a "technological solution to a technological problem." *Packet Intel. LLC*, 965 F.3d at 1309. The '922 Patent identifies two specific, technological problems: first, that large-file streaming is often riddled with interruptions, and second, that such streaming is difficult to track between devices. *E.g.*, Patent '922 at 1:64–2:1 ("While streaming technology obviates the waiting associated with mass download, any degradation experienced in the delivery of the content in real time introduces interruptions in the audio stream, causing breaks and interruption in the users [*sic*] experience of that audio stream."), Dkt. II, ECF No. 1-2. The patent provides the bookmark construct as a solution to both problems. *Id.* at 16:16–59. The bookmark tracks a small portion of downloaded content immediately surrounding the user's position in the stream and communicates that position (as well as other information) to associated devices. *Id.* at 16:17–48. In so doing, the bookmark improves the user's immediate streaming experience and their ability to stream on multiple devices. *See generally id.* Accordingly, the Court finds that the '922 Patent, as a whole, is directed to the improvement of existing technology, not merely an abstract idea.[7]

---

[7] Going further, the Court finds that the specificity in the '922 patent ensures that it does not tie up a "basic tool of scientific and technological work," *Alice*, 573 U.S. at 216, such as the mere concept of an electronic bookmark.

Defendants argue that the '922 Patent merely automates the existing human activity of accessing the same content in multiple locations.  Dkt. II Mem. Supp. 15–16.  The Court finds Defendants' description to be, again, severely reductive.  Described at this level of generality, surely all patents would be deemed invalid.  *See Contour IP Holding LLC*, 113 F.4th at 1380 (quoting *Enfish*, 822 F.3d at 1337) ("the practice of 'describing the claims at such a high level of abstraction and untethered from the language of the claims all but ensures that the exceptions to § 101 swallow the rule'").

In reality, the crux of the '922 Patent is the tracked range of content surrounding the user's position in the stream, which is communicated to another device.  Patent '922 at 27.  Such tracking and communicating is certainly not an activity generally performed by humans for which the instant patent employs computers as a tool to automate.  *Enfish*, 822 F.3d at 1336.  Instead, the claimed method "recite[s] a specific technique" for improving the streaming experience.  *Packet Intel.*, 965 F.3d at 1309.  As such, the '922 Patent is not directed to an abstract idea and survives the *Alice* test at step one.  The Motion to Dismiss will be denied as to Patent '922.

### 3. Patent '266

Defendants argue that the '266 Patent is likewise wholly directed to patent ineligible subject matter, reciting arguments similar to those relating to the previous patents.  Dkt. II Mem. Supp. 17.  Specifically, Defendants argue that synchronizing information is merely the automation of practices humans have done for centuries; thus, the '266 Patent aims to impermissibly monopolize an abstract idea.  *Id.*  In response, Plaintiff argues that, like the preceding patents, the '266 Patent offers a specific, technological solution to a specific, technological problem, and that

---

Rather, the patent only covers the specific bookmark construct it describes, which contains specific information, and works alongside specific downloading patterns.  *See* Patent '922 at 16:18–59.

the caselaw Defendants rely upon is inapplicable to the '266 Patent. Dkt. II Mem. Opp'n 21–22. The Court agrees with Plaintiff and will deny Defendants' Motion to Dismiss as to the '266 Patent.

Just like the preceding patents, the '266 Patent purports to "improve an existing technological process," and accordingly survives the *Alice* analysis at step one. *Enfish*, 822 F.3d at 1335 (citation omitted). As described above, the '266 Patent responds to two specific problems that come about whilst streaming content on multiple devices: (1) the difficulty in tracking one's place in the stream when switching between devices, and (2) interruptions in streaming. Patent '266 at 2:33–40. The patent purports to solve these problems through a particular process in which the user device communicates an assigned identifier to the server, and by extension, a secondary device, while simultaneously identifying necessary information and purging unnecessary information. *See id.* at 16:28–64. These solutions are clear, concrete improvements over the state of streaming technology. As such, the "focus" of the '266 Patent "is on a specific asserted improvement in [technological] capabilities," rather than an ineligible abstract idea. *Packet Intel.*, 965 F.3d at 1309 (quoting *Enfish*, 822 F.3d at 1335–36).[8] The '266 Patent survives *Alice* step one.

Defendants' arguments to the contrary are unavailing. First, similar to the arguments Defendants made as to the preceding patents, Defendants describe the instant patent at a high level of generality, arguing that the technology is merely automation of a process humans have long performed without computers. Dkt. II Mem. Supp. 17–18. Specifically, Defendants liken the invention disclosed by the '266 patent to musicians' use of sheet music, arguing that, like the instant patent, sheet music can be used to identify and synchronize content across different

---

[8] Like the '922 patent, beyond the strict demands of *Alice* step one, the Court notes that the specificity of the steps described in the method disclosed by the '266 patent ensure that the patent does not impermissibly tie up a basic, abstract concept such as synchronization and purging unnecessary data. *See Alice*, 573 U.S. at 216.

"devices" (instruments), and musicians may "purge" the sheet music they do not need.  Dkt. II Mem. Supp. 17–18.

Again, however, the Court finds Defendants' descriptions are "untethered from the language" of the '266 Patent, and thereby impermissibly reduce its complexity.  *Enfish*, 822 F.3d at 1337.  The '266 Patent is not merely an automated synchronization process combined with storage management.  Rather, it involves the creation and communication of a specific construct to a server and a secondary device, whereby the user is able to track one's position in otherwise asynchronous content *and* render the content on multiple devices simultaneously, without interruption.  *See* Patent '266 16:28–64.  The Court strains to conceive of an analogous situation in which humans are able to perform such an activity with simply pencil and paper.  *See Trinity Info Media, LLC*, 72 F.4th at 1361–62.  As such, the Court is unconvinced by Defendants' argument to this effect.

Second, Defendants' reliance on *Electric Power Group v. Alstom S.A.*, 830 F.3d 1350 (Fed. Cir. 2016), and *PersonalWeb Technologies, LLC v. Google LLC*, 8 F.4th 1310 (Fed. Cir. 2021) is misplaced; those cases do not disturb the Court's conclusion.  As described *supra*, in *Electronic Power Group*, the Federal Circuit deemed a patent invalid under the *Alice* standard after finding that the patent claimed a method wholly directed to abstract ideas.  *Elec. Power Grp.*, 830 F.3d at 1351; *see supra* Section IV.A.1.  There, unlike here, the invalid patent comprised a method in which each step was entirely achievable by humans with the use of pen and paper, and amounted to nothing more than the collection, analyzing, and displaying of data.  *Id.* at 1351–54.  And, unlike here, the *Electric Power Group* court found that the advance claimed by the relevant patent was one in which computers were merely used as a tool, rather than a specific improvement in the underlying technology.  *Id.* at 1354.  Since the '266 Patent discloses a process beyond that

achievable by humans and claims a specific advance over the existing technology, *Electronic Power Group* does not properly substantiate Defendants' argument.

Similarly, in *PersonalWeb Technologies*, the Federal Circuit found that a patent failed the *Alice* test because it merely claimed an "algorithm-generated content-based identifier to perform . . . data-management functions," much like how a librarian might assign call numbers to particular books in order to manage a book collection. *PersonalWeb Techs.*, 8 F.4th at 1316–17. While the '266 Patent also involves the creation of an identifier, the disclosed method reaches far beyond the creation and assignment of the identifier. Indeed, the creation of the identifier is simply a building block upon which the '266 Patent develops a process to render content across devices simultaneously, without interruption. *See* Patent '266 16:28–64. As such, *PersonalWeb Technologies* is inapposite to the case at bar, and the Court declines to rely upon it. The Court finds that the '266 Patent is, as a whole, directed to patent-eligible material.

4. Patent '488

Finally, Defendants argue that the '488 Patent is wholly directed to the abstract idea of "choosing a source based on quality of service." Dkt. II Mem. Supp. 14. Defendants liken the '488 Patent to that in *Broadcom Corporation v. Netflix Inc.*, where the Northern District of California invalidated patent claims disclosing a method of balancing network traffic by grouping, measuring, and regrouping traffic flows. 2021 WL 4170784, at *1, 6–7 (N.D. Cal. Sept. 14, 2021). In response, Plaintiff argues that, like each of the foregoing patents, the '488 Patent recites specific technological solutions to specific technological problems. Dkt. II Mem. Opp'n 27–28. Here, the Court agrees with Defendants that the '488 Patent is directed to an abstract idea. However, the Court will deny the Motion to Dismiss because Plaintiff has properly alleged that the '488 Patent involves an inventive element beyond its abstract aspect.

The method disclosed by the '488 Patent can be summarized into four steps: (1) downloading a list of servers; (2) tracking the servers' statistics, such as their efficiency and speed; (3) downloading a segment of content from the most efficient server; and (4) if that server's speed or quality degrades, switching to the next most efficient server for the download of the next segment of content. Patent '488 at 16:31–60. Steps one through three of the disclosed method are each directed to the abstract and seemingly intuitive idea of selecting the optimal source when streaming digital content. This kind of monitoring and reacting to information is a "mental process[] that can be performed in the human mind," as an individual could manually track server efficiency and select a streaming source based on this information. *Trinity Info Media*, 72 F.4th at 1361. Step four of the disclosed method continues with this abstract idea by instructing the user device to switch servers if the initial server's speed or quality degrades. Like the foregoing steps, this switch could be performed manually and merely uses a computer as a tool to automate a process achievable by humans. *See id.*; *Packet Intel., LLC*, 965 F.3d at 1309.[9]

The method disclosed by the '488 Patent is highly analogous to that in *Broadcom Corporation v. Netflix*, to which Defendants cite as support for their argument. Dkt. II Mem. Supp. 20. The *Broadcom* patent disclosed a method of balancing network traffic by grouping traffic flow, measuring traffic flow, and regrouping traffic flows. *Broadcom Corp.*, 2021 WL 4170784, at *1. In applying the *Alice* standard, the *Broadcom* court observed that the disclosed method could be readily performed by the human mind. *Id.* at *6. Just as a human could monitor and redirect network traffic, a human can monitor and reroute a download stream, as is described by

---

[9] Notably, step four also instructs the client device to perform the switch in a manner "imperceptible to a user of the client device." Patent '488 at 16:49. The disclosed method does not, however, instruct how a client device may do this. *See id.* As a matter of clear Federal Circuit and Supreme Court caselaw, a patent that covers results without detailing the process behind the results is itself directed to abstract ideas, since such a patent "would prohibit all other persons from making the same thing by any means whatsoever." *McRO*, 837 F.3d at 1314 (quoting *Le Roy v. Tatham*, 55 U.S. 156, 175 (1853)).

the '488 Patent. And, unlike the processes disclosed by the foregoing patents, monitoring and rerouting a stream does not strike the Court as particularly difficult for a human to do. *Compare* Patent '488 at 16:31–60 *with supra* Part IV.A.1 (citing *Occado Innov.*, 561 F. Supp. 3d at 49). Given that this monitoring and redirecting is the thrust of the '488 Patent, the Court finds that the patent as a whole is directed to an abstract idea. Accordingly, the Court proceeds to *Alice* step two.

At *Alice* step two, the Court must set aside those abstract aspects of the disclosed method and consider if what remains is an "inventive concept." *Alice*, 573 U.S. at 221. Here, Defendants focus their argument on the technology invoked by the claim and argue that these devices are merely conventional computer components. Dkt. II Mem. Supp. 20. Thus, Defendants argue that the '488 Patent lacks an inventive concept. In response, Plaintiff argues that the '488 Patent involves at least three "unconventional inventive elements":

> (1) a digital media stream that includes first and second segments, (2) first and second servers having the digital media stream stored thereon, and (3) downloading a second segment from the second server in the event of degradation in service from the first server and in dependence on tracked service level statistics after having already downloaded a first segment from the first server.

Dkt. II Mem. Opp'n 31–32.

Ultimately, the inventiveness of the elements beyond the abstract portion of the '488 Patent is a question of fact for the jury. *Berkheimer*, 881 F.3d at 1368. However, to survive the present Rule 12(b)(6) motion, Plaintiff need only allege an inventive aspect to the '488 Patent.

After setting aside the abstract portions of the disclosed method, one aspect of the '488 Patent remains: the use of segmented digital media streams. *See* Patent '488 at 16:41–43, 54–55. Based on the language of the claim, the use of the abstract idea in conjunction with segmented streams could plausibly constitute an inventive element, since the disclosed method is only able to constantly monitor and redirect its streaming sources because of the segmented nature of the

streams. *See id.* The '488 Patent specification further elucidates the inventiveness of the segmented streaming, asserting that the instant invention obviates issues associated with traditional, non-segmented streaming, namely, slow delivery and difficulty tracking progress. *See id.* at 2:45–48. Finally, in both Complaints, Plaintiff asserts that, at the time of invention, the use of segmented files represented a significant advance over the prior art. Dkt. I Compl. ¶ 41 ("[Plaintiff] invented, among other things, means to segment . . . the streaming files so that these files could be streamed irrespective of their sizes, a major limitation to downloading content at the time"); Dkt. II Compl. ¶ 57 (same). Accordingly, the Complaints support the inference that the abstract idea as outlined by the Court, applied in tandem with the streaming of segmented files, amounts to "significantly more" than the abstract idea by itself. *Alice*, 573 U.S. at 217–18. Indeed, the application of the abstract idea to such files "ensure[s] that the [claim] is more than a drafting effort designed to monopolize the [abstract idea]." *Id.* at 221.

Thus, based on the language of the claim, the specification, and the allegations in the Complaints, Plaintiff sufficiently alleges that the '488 Patent contains an inventive element, notwithstanding its otherwise abstract nature. Because the Court finds that Plaintiff has adequately alleged a claim as to each of the patents-in-suit, the Court will deny Defendants' Rule 12(b)(6) Motions to Dismiss.

**B. Venue**

In support of their Rule 12(b)(3) Motion to Dismiss, Defendants argue that the appropriate venue for Plaintiff's action against Audible is the District of New Jersey, since Audible neither resides in, nor conducts business in, the Eastern District of Virginia. Dkt. I Mem. Supp. 17–20. In response, Plaintiff argues that Audible conducts business in this district by virtue of its local datacenters and Amazon's HQ2. Dkt. I Mem. Opp'n 28–31. The Court finds that Plaintiff has not demonstrated that the Eastern District of Virginia is an appropriate venue for Audible.

Accordingly, the Court will grant Defendants' Rule 12(b)(3) Motion to Dismiss as to Plaintiff's claims against Audible.

The appropriate venue for a patent infringement action is controlled by 28 U.S.C. § 1400(b), which provides: "Any civil action for patent infringement may be brought in the judicial district where the defendant resides, or where the defendant has committed acts of infringement and has a regular and established place of business." Section 1400(b) "is specific and unambiguous; it is not one of those vague principles which, in the interest of some overriding policy, is to be given a 'liberal' construction." *Schell v. Peter Eckrich & Sons, Inc.*, 365 U.S. 260, 264 (1961). As such, when applying § 1400(b), "courts construe its requirements strictly." *Symbology Innovs.*, 282 F. Supp. 3d at 929.

Under § 1400(b), venue is only appropriate (1) where a defendant resides; or (2) where it has committed an alleged act of infringement *and* conducts regular business. § 1400(b). As to the first venue option, Supreme Court precedent makes clear that, for the purposes of § 1400(b), Audible only resides in Delaware, its state of incorporation, Dkt. I Compl. 2. *TC Heartland LLC v. Kraft Foods Grp. Brands LLC*, 581 U.S. 258, 258 (2017) ("'residence' in § 1400(b) refers only to the [s]tate of incorporation"). As to the second venue option, Defendants appear to concede that Plaintiff has adequately alleged acts of infringement by Audible in the Eastern District of Virginia. *See* Dkt. I Mem. Supp. 18–19. Thus, the dispositive question is whether Audible conducts regular business in this district.

Plaintiff asserts two alternative theories in support of its assertion that Audible conducts regular business in the Eastern District of Virginia. First, it argues that Audible conducts business in this district by virtue of its use of AWS's servers in Ashburn, Virginia. Dkt. I Mem. Opp'n 28–29. Alternatively, it asserts that Audible and Amazon are so interconnected that Amazon's

presence in the district can be imputed to Audible.  *Id.* at 30–31.  The Court disagrees as to both theories.

To establish that a defendant has a regular, established place of business in a particular district within the meaning of § 1400(b), a plaintiff must demonstrate:  (1) the existence of a physical place in the district; (2) that the physical place is a regular and established place of business; and (3) that the physical place "is the place of the defendant."  *In re Google LLC*, 949 F.3d 1338, 1343 (Fed. Cir. 2020) (citing *In re Cray Inc.*, 871 F.3d 1355, 1360 (Fed. Cir. 2017)).

As a matter of law, Audible's use of the AWS datacenters in Ashburn cannot render Ashburn, Virginia, a regular and established place of business as to Audible.  In its seminal decision *In re Google LLC*, the Federal Circuit determined that "a server rack, shelf, or analogous space" could be considered a "physical place" within the meaning of § 1400(b).  494 F.3d at 1344.

However, passive presence in a district is insufficient to establish venue.  Rather, venue attaches only where the individuals staffing the "physical place" perform the defendant's substantive business, as opposed to activities "merely connected to, but . . . not themselves constitut[ing] the defendant's conduct of business in the sense of production, storage, transport, and exchange of goods or services."  *Id.* at 1347.  Unless a defendant's substantive business is maintenance, a physical place staffed by employees who only perform maintenance on behalf of a defendant is insufficient to establish venue.  *Id.*

Applying *In re Google* to the instant case, the Court finds that while Audible's use of the servers at the AWS datacenter likely qualifies as having a "physical place," the datacenter does not constitute a "regular and established place of business."  *Id.* at 1344, 1347.  Plaintiff argues that the AWS datacenter establishes venue as to Audible because it is staffed by agents who "install[], host[], operate[], and maintain[] Audible's Northern-Virginia-based servers." Dkt. I Mem. Opp'n 28.  However, Audible is not in the business of server installation, operation, or

maintenance—it is in the business of distributing audiobooks.  *See, e.g.*, *id.*  Thus, the agents staffing the AWS datacenter do not perform Audible's "conduct of business" within the meaning of § 1400(b).  *In re Google LLC*, 494 F.3d at 1347.  As such, Plaintiff cannot use the AWS datacenter to establish the Eastern District of Virginia as an appropriate venue for Audible.

Plaintiff next argues that Amazon and Audible are so interconnected that Amazon's HQ2 also constitutes Audible's place of business.  Dkt. I Mem. Opp'n 29–31.  Defendants do not contest that HQ2 is a physical place regularly conducting Amazon's business, satisfying the first two elements of the § 1400(b) standard.  *See* Reply Br. Supp. Defs.' Mot. Dismiss 23, Dkt. I, ECF No. 23.  Thus, the only question is whether HQ2 is properly considered "the place of" Audible.  *In re Google LLC*, 494 F.3d at 1343.

"A threshold inquiry when determining whether the place of business of one company can be imputed to another, related company is whether they have maintained corporate separateness." *Andra Grp., LP v. Victoria's Secret Stores, LLC*, 6 F.4th 1283, 1289 (Fed. Cir. 2021).  "[W]here related companies have maintained corporate separateness, the place of business of one corporation is not imputed to the other for venue purposes."  *Id.*  Conversely, the business of one entity is imputed to another if the plaintiff can demonstrate that the defendant company is the alter-ego of the other.  *Celgene Corp. v. Mylan Pharms. Inc.*, 17 F.4th 1111, 1125 (Fed. Cir. 2021).  "Corporate separateness is an issue of regional-circuit law."  *Id.* (citing *Wechsler v. Macke Int'l Trade, Inc.*, 486 F.3d 1286, 1295 (Fed. Cir. 2007)).

The Fourth Circuit has "articulated several factors that 'guide the determination of whether one entity constitutes the alter ego of another.'"  *Vitol, S.A. v. Primerose Shipping Co. Ltd.*, 708 F.3d 527 (4th Cir. 2013) (quoting *Ost-West-Handel Bruno Bischoff GmbH v. Project Asia Line*, 160 F.3d 170, 174 (4th Cir. 1998)).  These factors include:

gross undercapitalization, insolvency, siphoning of funds, failure to observe corporate formalities and maintain proper corporate records, non-functioning of officers, control by a dominant stockholder, and injustice or fundamental unfairness[;] ... intermingling of funds; overlap in ownership, officers, directors, and other personnel; common office space; the degrees of discretion shown by the allegedly dominated corporation; and whether the dealings of the entities are at arm's length.

*Id.*  Notably, the Fourth Circuit does not permit a district court to disregard corporate separateness based on a single factor.  *De Witt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.*, 540 F.2d 681, 687 (4th Cir. 1976).  In fact, a district court may not determine that an entity is the alter ego of another absent "an element of injustice or fundamental unfairness." *Id.*  Piercing the corporate veil and disregarding corporate separateness is only appropriate in extraordinary circumstances. *E.g.*, *Keffer v. H.K. Porter Co., Inc.,* 872 F.2d 60, 64 (4th Cir.1989).

In support of its alter ego theory, Plaintiff notes that Audible and Amazon share some employees, jointly promote their businesses, and that Amazon includes Audible's revenue in its annual disclosures.  Dkt. I Mem. Opp'n 29–31.  Notably, Plaintiff does not contend that Amazon and Audible's connectedness constitutes any sort of "injustice or fundamental unfairness." *De Witt Truck Brokers*, 540 F.2d at 687.  Based on this absence alone, the Court is barred from finding that Audible is Amazon's alter ego. *Id.*

Beyond this critical absence, however, Plaintiff alleges only two factors from the Fourth Circuit's alter ego test:  overlap in personnel and intermingling of funds. *Id.*; Dkt. I Mem. Opp'n 29–31.  Defined by just those factors, Audible's relationship with Amazon falls far short of the extraordinary circumstances required to disregard corporate separateness.  Indeed, the Fourth Circuit and the Supreme Court have previously found corporate separateness even where the entities were far more intertwined than Amazon and Audible. *See Cannon Mfg. Co. v. Cudahy Packing Co.*, 267 U.S. 333, 335 (1925) (finding corporate separateness despite the defendant owning the entire capital stock of the other corporation, "dominat[ing] the [other] corporation,

immediately and completely, and exert[ing] its control both commercially and financially in substantially the same way, and mainly through the same individuals."); *Vitol*, 708 F.3d at 544, 547 (finding corporate separateness even where the relevant entity "made no independent business decisions" and lacked a physical location aside from the other entity's address).  Accordingly, the Court cannot find that Amazon's HQ2 constitutes the "place of" Audible.  As such, Plaintiff has failed to demonstrate that the Eastern District of Virginia is an appropriate venue as to Audible.

Finding that the Eastern District of Virginia is an improper venue as to Audible, the Court must next determine the appropriate remedy.  As noted above, 28 U.S.C. § 1406(a) provides that "[t]he district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought."  The decision to dismiss or transfer lies in the sound discretion of the district court. *Nichols v. G.D. Searle & Co.*, 991 F.2d 1195, 1200 (4th Cir. 1993) (citing *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988)).

Here, Defendants ask that the Court transfer the portion of the present dispute comprising Plaintiff's claims against Audible to the District of New Jersey.  Dkt. I Mem. Supp. 18–19.  However, neither party fully addresses the propriety of the District of New Jersey under 28 U.S.C. § 1400(b). *See id.*; Dkt. I Mem. Opp'n 31–34; Dkt. I Reply 20–25, ECF No. 23.  Plaintiff alleges in its Complaint that Audible's principal place of business operates in Newark, New Jersey, Dkt. I Compl. ¶ 9, though it is incorporated—and therefore resides—in Delaware, *id.* ¶ 10; *TC Heartland LLC*, 581 U.S. at 258.  Thus, under § 1400(b), the District of New Jersey is only appropriate if alleged acts of infringement took place there, and neither party locates any of Audible's alleged infringement in New Jersey. *See generally* Dkt. I Mem. Supp. 18–19; Dkt. I Mem. Opp'n 31–34; Dkt. I Reply 20–25.

Given the parties' joint failure to establish an alternative venue as to Audible, the Court cannot say that the "interest[s] of justice" support transferring to the District of New Jersey, as it risks transferring to an equally inappropriate venue. *See Colony Ins. v. Progressive Casualty Ins. Co.*, 531 F. Supp. 3d 1102, 1107–08 (E.D. Va. 2021) (dismissing an action brought in the wrong venue where parties did not establish the appropriate transferee venue). Further, the Court notes that Plaintiff spends significant ink describing the inconvenience posed by transferring the dispute against Audible to the District of New Jersey and arguing that it "taints Plaintiff's right to choice of forum." Dkt. I Mem. Opp'n 33. While Plaintiff likely did not intend it to, this argument supports dismissal, as doing so would allow Plaintiff to refile in the appropriate, convenient forum of its choosing. Thus, Plaintiff's claims against Audible will be severed and dismissed without prejudice.[10]

## V. CONCLUSION

The Court finds that Plaintiff has stated valid claims as to each of the patents-in-suit but has not demonstrated that the Eastern District of Virginia is a proper venue as to Audible. As such, Defendants' Docket I Motion to Dismiss will be granted in part and denied in part. Defendants' Docket II Motion to Dismiss will be wholly denied.

Date: <u>March 3, 2025</u>                          /s/ _____
Richmond, Virginia                          Roderick C. Young
                                            United States District Judge

---

[10] Plaintiff asks the Court to allow for limited venue discovery. Dkt. I Mem. Opp'n 33–34. Like the choice between transfer and dismissal, whether to order venue-specific discovery lies within the broad discretion of the district court. *See Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351, n.13 (1978). When the requesting party provides "no reason to believe that the additional information sought would alter the outcome," the Court is well-empowered to reject such a request. *Symbology Innovs.*, 282 F. Supp. 3d at 933–34 (citing *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390 (4th Cir. 2003)). Here, Plaintiff provides no reason for the Court to believe that additional discovery would contravene the evidence presently before this Court. Particularly, there is no reason to believe that additional evidence would contradict the competent evidence provided by Defendants that Audible has no presence in Virginia, *see generally* Decl. Anne Erni, Dkt. I, ECF No. 19, and there is no reason to believe that additional discovery would evidence extraordinary circumstances to warrant application of the alter ego remedy, *Keffer*, 872 F.2d at 64. As such, the Court denies the request for venue discovery.